# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9229 | **DATE** | 10/17/2003 |
| **CASE TITLE** | Joann Ulloa vs. Jo Anne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons stated in the attached Memorandum Opinion and Order, plaintiff's motion for summary judgment [11-1] is granted, and the case is remanded to the Commissioner of Social Security for further proceedings consistent with this opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| | Notices mailed by judge's staff. | | | | | |
| | Notified counsel by telephone. | | OCT 2 0 2003 | | |
| ✓ | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | | | |
| hmb | courtroom deputy's initials | | | date mailed notice | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

Document Number: 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **JOANN ULLOA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )      **Case No. 01 C 9229** |
| | ) |
| **JO ANNE B. BARNHART, Commissioner** | ) |
| **of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

NAN R. NOLAN, Magistrate Judge:

Plaintiff Joann Ulloa seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§416, 423. This matter is before the Court on Ulloa's motion for summary judgment. Ulloa seeks to have the Court reverse or remand the Commissioner's decision. The Commissioner seeks an order affirming the Agency's final decision. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). For the reasons set forth below, Ulloa's motion is granted, and the case is remanded for further proceedings consistent with this opinion.

DOCKETED OCT 20 2003

## PROCEDURAL HISTORY

Ulloa claims that she became disabled on February 21, 1999[1] due to multiple orthopaedic problems, specifically, left knee problems, tendinitis in her left hand, and hip and back pain. (R. 12, 25, 91-93, 104, 184; Pl. Mem., p. 4) In April 2000, she applied for DIB, but her application was denied initially on June 22, 2000 and again on reconsideration on August 11, 2000. (R. 61, 66, 91-93) The Commissioner found that while Ulloa's condition caused some restrictions on her ability to function, it did not prevent her from working, and, specifically, she could return to the type of work she performed as an assembler. (R. 61) Ulloa appealed the Commissioner's decision and requested an administrative hearing, which was held on April 12, 2001. (R. 20-58, 69) On July 15, 2001, the Administrative Law Judge ("ALJ") denied Ulloa's claim for DIB. (R. 8-19) The ALJ found that Ulloa was not disabled because she could perform a significant number of sedentary jobs. (R. 17-19) On October 4, 2001, the Appeals Council denied Ulloa's request for review (R. 4-5), and the ALJ's decision therefore became the final decision of the Commissioner. See 20 C.F.R. §§ 416.1481.

## FACTUAL BACKGROUND

Ulloa, born on June 20, 1966, was 35 years old on the date of the ALJ's decision. (R. 18, 91, 98) She has a high school education and completed a certified nursing assistant program, and has past relevant work experience as a nurse's assistant, habitational instructor, assembler, and fast food assistant manager. (R. 18, 26-27)

---

[1]     Ulloa originally alleged a disability onset date of March 8, 1999 (R. 91; Pl. Mem., p. 4), but amended the date to February 21, 1999 at the hearing. (R. 24-25)

## A.    Medical Evidence

Ulloa suffered two injuries to her left knee. (R. 214) The first injury occurred in January 1998 while Ulloa was working in a nursing home. (R. 134, 139, 214, 239-40, 248) The occupational medicine examination report provided an assessment of "sprain and contusion left knee." (R. 239) After the injury, Ulloa took one week off and then returned to work as a certified nursing assistant ("CNA") but with the restrictions of no climbing, squatting, or excessive walking. (R. 219, 239, 241-43, 251) In May 1998, Ulloa reported that the pain was getting worse and that she was having a hard time tolerating eight hours of work. (R. 223) Ulloa had arthroscopic surgery (meniscectomy) on her left knee on June 12, 1998 to repair a torn left lateral meniscus. (R. 134, 162, 200, 214, 251) Ulloa had physical therapy treatments after her injury and continued the treatments until approximately August 1998. (R. 219-35, 236-38, 251) Ulloa's physical therapy progress note dated August 5, 1998 indicated that she "continue[d] to progress well in therapy." (R. 233) She returned to her full work duties in August or September 1998. (R. 12, 28, 134, 251)

On approximately February 20, 1999, Ulloa re-injured her knee. (R. 135, 139, 178, 214, 251) The injury occurred while Ulloa was transferring a patient onto a toilet at the nursing home where she was employed. (R. 162, 178. 251) An examination of Ulloa's left knee showed no evidence of fracture, dislocation, arthritic changes, bony abnormalities, or soft tissue problems, and indicated full range of motion, stable ligaments, intact cartilage, and normal left patella. (R. 158, 251) Dr. Alexander Jablonowski assessed the injury as a sprained left knee. (R. 251) She was treated with crutches and Anaprox DS. (R. 251-52) Ulloa was 5'5" and weighed 280 pounds at the time of this injury. (R. 254)

3

The following month, Dr. Robert Nixon also diagnosed left knee sprain and assessed Ulloa's impairments as including "increased left knee pain and decreased ROM and strength." (R. 162-63, 178-79) Dr. Nixon restricted Ulloa to "primarily sedentary activity with limited standing and walking, using crutches as needed," and recommended anti-inflammatory medication and physical therapy. (R. 178) Ulloa began physical therapy that month and continued the therapy throughout approximately 1999. (R. 162-64, 165-77, 204-05) She reported no knee pain at rest, but increased pain with bending and prolonged walking. (R. 162) She also reported working light duty at her job and that she could walk without an assistive device. (Id.) In April 1999, Dr. Nixon noted that while Ulloa continued to have some pain in the knee, he could not find any significant objective abnormalities, and informed Ulloa that he had no specific intervention to suggest other than to increase her activities at work as tolerated and continue taking anti-inflammatory medication. (R. 180-81) Dr. Robert Hall, an orthopedic surgeon, also examined Ulloa in April 1999 and reported that a full set of x-rays taken of the knee were "unremarkable," although Ulloa continued to have complaints of pain in her left knee. (R. 28, 214)

In May 1999, an MRI of Ulloa's left knee indicated chronic interstitial tear, but no evidence of meniscal tear. (R. 159) In progress notes that month, Dr. Hall reported that Ulloa had not done well with her prior treatments of NSAID, Vicodin, cortisone, arthroscopy and physical therapy. He gave her a work release for two weeks. Later that month, Ulloa reported that her knee pain had improved since being off work. (R. 205) Dr. Hall reported at that time that her knee was stable, and recommended that she remain off work for two more weeks and consider returning to private nursing duty which is less demanding. (R. 149, 205-08) In June

4

1999, Ulloa had improvements in pain levels, range of motion, and strength. (R. 173, 205, 207-08) Dr. Hall advised her that she could not have the ACL reconstruction until she entered the 190 pound range. (R. 205-06) At this time she was still in the vicinity of 280 pounds. (R. 206)

In March through May 2000, a chiropractor named Dr. Wolschlager treated Ulloa for back pain. (R. 274-77, 280) He reported "lumbar/lumbosacral neuritis" and "mild arthritic changes" in her lumbar spine, and noted that Ulloa still had pain from the ACL tear. (R. 187-89) He also reported that Ulloa's low back pain and neck stiffness was "slightly better" and that her condition was "improving." (R. 277) During this same time period, Dr. Hall opined that Ulloa's "ability to sit, handle objects, hear, speak, and travel [we]re unrestricted," and that her "ability to stand for long periods, move about a great deal, lift and carry heavy objects may be impaired due to her knee pain as well as some back pain she [wa]s experiencing." (R. 185, 203) He further noted that she could ambulate more than 50 feet without assistance, which he characterized as "normal," and that her left knee was "unremarkable." (R. 185) On June 5, 2000, a state agency physician reviewed the medical evidence and concluded that Ulloa could lift 20 pounds occasionally and 10 pounds frequently, and could sit, stand, and walk for six hours each day in an eight-hour workday. (R. 194, 200) The physician further opined that Ulloa's pushing and pulling abilities were unlimited, and that Ulloa could occasionally climb, stoop, and crouch. (R. 194-95) The state agency physician's primary diagnosis was an ACL injury to the left knee, and secondary diagnosis was osteoarthritis of the spine. (R. 193, 200) Around this time, Ulloa reported that the pain in her left knee had altered her walking so as to cause back pain. (R. 200) In July 2000, Dr. Hall noted no improvement in Ulloa's knee, but stated that her ambulation

5

continued to be "normal." (R. 202-03)  In September 2000, Ulloa was fitted for a knee brace.  (R. 211)

In January 2001, Dr. Hall noted that the knee brace was proving to be helpful, although Ulloa still had difficulty climbing stairs.  (R. 209)  He concluded that Ulloa could not "do either stand up or sit down work due to the knee and back respectively." (Id.)  He gave Ulloa a note indicating that she was unable to work indefinitely, and discharged her from his care.  (Tr 209, 216)  That same month, Dr. John Prunskis noted that Ulloa's chief complaint was back pain.  (R. 217)  Dr. Prunskis referred Ulloa for an MRI due to her back pain complaints, which indicated that her lumbar spine was completely normal.  (R. 272-73)  At this time, Ulloa weighed 350 pounds. (R. 217)

In February 2001, Dr. Hall performed an examination of Ulloa's left knee after Ulloa reported feeling spontaneous pain there.  (R. 215, 270)  Dr. Hall noted no effusion or joint line tenderness, and found the ligaments to be intact.  (R. 270)  Dr. Hall further noted that x-rays taken of the knee showed no acute changes.  (Id.)  He wrote a letter indicating that Ulloa's symptoms would not improve and that she would not be able to return to her past job as a nurse's aid in the nursing home.  (R. 215)  He stated that "the original diagnosis was a strain of the ACL ligament" which left Ulloa unable to withstand long durations of walking, standing, or to perform any heavy lifting, and that Ulloa's knee remained "extremely symptomatic." (Id.)  Dr. Hall concluded that Ulloa was "not likely to improve and, thus, has sustained a permanent injury as a result of the February [1999] mishap." (Id.)  Dr. Prunskis also examined Ulloa that month and reported that she was still having "some discomfort in the lower back" and "some problems with her left knee." (R. 258)  In March 2001, Dr. Hall reported that Ulloa had "improved relative to her l[eft]

6

knee" and that her knee felt "better at this juncture." (R. 269) Dr. Hall further noted that Ulloa would be discharged from his care to do activities as tolerated and to return on an as-needed basis. (Id.) In April 2001, Dr. Prunskis stated that Ulloa's left knee felt "better compared to her last visit when she stated that she had sprained it." (R. 260)

## B.    Plaintiff's Testimony

At the hearing before the ALJ, Ulloa testified that she had injured her knee in January 1998, had surgery for the injury in June 1998, and then returned to work in September 1998. (R. 28) Ulloa testified that she re-injured her knee in February 1999 but did not have surgery for that injury. (R.28-29) In response to the ALJ's questions regarding her second knee injury, Ulloa testified that she had an "ACL tear" at the time of the hearing, and that she had strained it a couple of weeks earlier when she was getting out of a chair. (Id.) Ulloa testified that she was told she needed to lose weight before she could undergo reconstructive surgery for the ACL tear. (R. 29) Ulloa had been unsuccessful in losing weight as of the date of the hearing. (Id.)

Ulloa noted that Dr. Prunskis had observed possible problems with her lower back from an MRI taken in January 2001, but found that her lumbar spine was normal. (R. 30-31, 38) Dr. Prunskis prescribed anti-inflammatory and nerve-block medication treatments. (R. 32-33) Ulloa received cortisone injection treatments when she re-sprained her left knee after getting off the couch. (R. 34) She testified that she does not feel any more pain from the sprain, but she still feels pain from the original injury. (Id.) Her knee gives out sporadically and will sprain if she turns it in a special way or bends it while sleeping. (Id.)

Ulloa started seeing Dr. Chada, a psychiatrist, in January 2001. (Id.) Dr. Chada prescribed Zolof for her depression which had not helped her. (R. 34-35) Ulloa saw Dr. Chada

7

twice between January and April 2001. (R. 35) She would see a counselor if she could afford it. (R. 35-36)

Ulloa takes Vicodin and Zelebrex, and, on occasion, muscle relaxers. (R. 36) She also wears a knee brace, which helps prevent her knee from turning and spraining. (Id.) She testified that the pain in her hips and back are the worst, and that it sometimes extends to her shoulder and neck. (R. 37, 39) She goes to bed or takes medication to relieve the pains. (R. 37) She also has pain in her left knee which gets more severe when she is walking or standing for too long. (R. 37-38) To relieve this pain, she takes Tylenol, anti-inflammatory medicine, and, when the pain is really bad, Vicodin. (R. 38) She also ices it or heats it to prevent it from swelling. (R. 38, 51)

Ulloa does not use any assistive device to help her walk, but used crutches in 1999 and a walker in 1998. (R. 40) She testified that she can walk only about a half block before having to stop. (Id.) She can stand for about 5-10 minutes before needing to sit down or move. (R. 41) She can sit for at least 30 minutes, but begins feeling pain after about 10 minutes of sitting. (R. 41, 50) She stated that Dr. Prunskis and Dr. Hall advised her not to lift more than 10 pounds. (R. 41)

Ulloa has two children, ages six and four and a half. (R. 25) On a typical day, Ulloa makes breakfast, drives her son to school (which is a half block away), spends time with a neighbor or friend, watches her daughter, watches television, reads, cooks meals, folds laundry, dusts counters, and washes dishes. (R. 26, 42-43, 46) She is able to take a shower and dress herself, but cannot zip or hook anything in the back. (R. 44) She can go to the grocery store, although she sometimes uses a wheelchair there. (Id.) She does not vacuum, sweep, mop, or

change the sheets. (R. 43) She does not go to restaurants, movies, the park, the pool, or religious services, and does not exercise. (R. 42-45)

Ulloa testified that she cannot return to work as a CNA, the last job she held prior to her injury, because she cannot stand for more than 15 minutes, lift, or sit, and has bad back and head pain. (R. 27) She stated that she cannot do assembly or assistant manager work, which she did previously, because she has tendinitis in her left hand and shoulder. (Id.) She is not currently being treated for tendinitis. (Id.) She stated that she cannot do other light or sedentary type work, such as cashier work, because she has back and knee pain. (R. 28)

In her last job as a CNA, Ulloa testified that she lifted as much as 100 pounds. (R. 47) She stood for about seven and a half hours each day, and had to bend, stoop, push, pull, and crawl on the job. (Id.) As an assistant manager at Brown's Chicken, she lifted about 40-50 pounds, and spent about five to six hours standing. (R. 48) As an assembler, she lifted as much as 40 pounds and sat or stood for varying amounts of time. (R. 48-49, 54) As a packer, she lifted up to 50 pounds and sat for about seven hours. (R. 49)

Ulloa testified that she weighed 352 pounds on the date of the hearing, April 12, 2001. (R. 51) When she was injured in February 1999, she weighed 280 pounds. (R. 52)

## C.    Vocational Expert Testimony

Susan Entenberg testified at the hearing as a vocational expert ("VE"). She described Ulloa's assembly job as medium/unskilled; her habilitation instructor job as light/semi-skilled; her assistant manager job as medium/semi-skilled; and her CNA job as heavy/semi-skilled. (R. 55) The ALJ posed a series of hypothetical questions to the VE. The VE stated that if Ulloa could sit for six hours, stand and walk for six hours, lift and carry up to 10 - 20 pounds,

9

occasionally climb stairs and ramps, but never climb ladders, ropes or scaffolds, or crawl or kneel, she could perform her habilitation instructor work. (Id.) When the VE was asked to assume that Ulloa's testimony regarding her restrictions and limitations was credible in all respects, including her need to lie down and ice and elevate her leg on occasion throughout the day, the VE responded that there would be no jobs that Ulloa could perform. (R. 56-57) The VE testified that if Ulloa could sit for six to eight hours a day, stand or walk for less than two hours a day, and only stoop or climb on occasion, she could not perform any of her past work, but could perform a full range of sedentary, unskilled work. (R. 56) The VE testified that in the Chicago metropolitan area, there were approximately 10,000 assembly positions, 5,000 packer positions, and 5,000 telemarketer positions Ulloa could perform. (Id.) If Ulloa needed to sit or stand at will, the telemarketer positions would be eliminated and there would be only about 4,000 assembly and 2,000 packer positions Ulloa could perform. (Id.) When the tendinitis in Ulloa's left (non-dominant) hand was taken into account, the VE stated that the number of existing assembly and packing jobs would be reduced. (R. 57-58)

### D.    The ALJ's Findings

The ALJ found that Ulloa met the disability insured status requirements and was not engaging in disqualifying substantial gainful activity. (R. 12, 18) She next found that Ulloa had the following medically determinable impairments which significantly limited her ability to perform basic work activities: lower back pain secondary to lumbosacral neuritis and lumbar myospasm; obesity; and left knee pain of undetermined etiology, meniscectomy for meniscal tear. (R. 12, 18) However, she concluded that Ulloa did not have an impairment or combination of impairments that were listed in, or medically equal to, the impairments listed in the Social

10

Security Regulations. (R. 12, 18) See 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regs. No. 4. She stated, "[T]aking into consideration the combined effects of obesity with the claimant's lower back pain and left knee pain, these conditions are not accompanied by the neurological deficits required under either section 1.03 or section 1.05C of the Listing of Impairments, nor does the record contain other findings of equivalent severity." (R. 12) As a result, the ALJ assessed Ulloa's residual functional capacity ("RFC"). She found that Ulloa's medically determinable impairments precluded the following work-related activities: lifting more than 10 pounds at a time or more than occasional lifting or carrying small articles such as docket files, ledgers or small tools; standing and/or walking for more than a total of two hours in an eight-hour workday; sitting for more than a total of six hours in an eight-hour workday; stooping, crouching, climbing stairs more than occasionally; and climbing ropes, ladders, or scaffolds, or crawling or kneeling even occasionally. (R. 13-14, 18) Based on these limitations, the ALJ found that Ulloa's RFC was for a limited range of sedentary work. (R. 18)

The ALJ found that the medical findings failed to provide strong support for Ulloa's allegations of disabling symptoms and limitations. (R. 14) She found that Ulloa had a left knee injury which was surgically repaired (by a meniscectomy) in June 1998 after extensive conservative treatment failed to alleviate her pain and that she was able to return to full work duties in August 1998. (Id.) She referenced Dr. Nixon's assessment regarding the re-injury of her left knee and that he had prescribed a course of conservative treatment for her left knee sprain but had no specific intervention to recommend when Ulloa continued to complain of sharp pain. (Id.) She noted that a May 1999 MRI study of the left knee revealed "a chronic interstitial tear of the anterior cruciate ligament (ACL), but no evidence for meniscal tears." (R. 14, 159) She noted

11

that Dr. Hall's progress notes reflected that Ulloa continued to complain of left knee pain but that there was "no evidence of any structural changes." (R. 15) She further acknowledged Dr. Hall's statement that Ulloa "would have to bring her weight down to around 190 pounds before ACL reconstructive surgery could be performed" and that "there was overall significant improvement to the left knee" and "she was being discharged from his care to do activities as tolerated and to return on an as-needed basis." (Id.) (citing R. 183-85, 201-15, 269-70) The ALJ also noted that a January 2001 MRI study of Ulloa's lumbar spine was "normal," and that "Dr. Prunskis noted improvement in the claimant's left knee pain" in April 2001. (R. 15) The ALJ also referred to Dr. Prunskis' indication that "the claimant was overweight and this contributed to her low back pain and hip pain, and persistent left knee pain." (Id.) The ALJ found that "little, if any, notable medical evidence [] pertains to [Ulloa's] allegations of disabling depression." (Id.)

The ALJ found that the objective medical evidence did not provide a basis for finding limitations greater than those determined in her decision. (Id.) She found that consideration of the factors described in 20 C.F.R. § 404.1529(c)(3) and Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 (S.S.A. 1996), led her to conclude that Ulloa's allegations of disabling symptoms and limitations could not be accepted, and that Ulloa's testimony was not entirely credible. (R. 15-16) On this point, she stated: "There are several factors, however, which are convincing that the claimant lacks full credibility. The undersigned first notes that the claimant's description of the severity of the pain has been so extreme as to appear implausible, especially in light of medical records that reflect substantial improvement in her symptoms. In addition, [Ulloa] has not generally received the type of medical treatment one would expect for a totally disabled individual." (R. 16) She further found in support of her credibility determination that

12

the treatment received by Ulloa for her allegedly disabling impairments was routine or conservative in nature and that her use of medications did not suggest the presence of impairments which were more limiting than those found in the ALJ's decision. (Id.) The ALJ also noted that Ulloa described daily activities which were not limited to the extent one would expect given her complaints. (Id.) Finally, the ALJ relied on the RFC conclusions reached by the state agency physicians to support her conclusion. (R. 17) The ALJ noted that while Ulloa had a constant sharp pain in her left knee, her condition had been helped by a knee brace and she had not had to use any assistive device to walk in 2000-01, as opposed to the two years preceding that. (R. 16) She also observed that "[a]lthough a 1999 MRI revealed the ACL was torn, recent doctor notes refer to the claimant's knee as just having a 'strain.'" (Id.) (referring to R. 215, 269-70) In addition, the ALJ noted that Ulloa took Vicodin "only when the pain is really bad, about once or twice a week." (R. 16)

Based on the VE's testimony, the ALJ found that Ulloa could not perform any of her past relevant work since even her least demanding prior job required her to perform work activities inconsistent with the RFC determined by the ALJ. (R. 17, 18) The ALJ found, however, that Ulloa could perform a limited range of sedentary work based on her RFC limitations and found that, based on the VE's testimony, there were a "significant number of jobs in the economy" that Ulloa could perform. (R. 17-19) The ALJ concluded that Ulloa was not under a "disability" or entitled to disability benefits under the Act. (R. 19) See 20 C.F.R. § 404.1520(f).

13

# DISCUSSION

## A.    Standard of Review

Judicial review of the Commissioner's final decision is governed by §205(g) of the Social Security Act. See 42 U.S.C. §405(g). The ALJ's findings are generally entitled to great deference because the ALJ, not the court, is responsible for weighing conflicting evidence and for making a final determination of whether the claimant is disabled. See Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000) (court may not "reweigh the evidence, or substitute [its] own judgment for that of the Commissioner"). The Court may reverse the ALJ's decision "only if the evidence 'compels' reversal, not merely because the evidence supports a contrary decision." Betancourt v. Apfel, 23 F. Supp. 2d 875, 880 (N.D. Ill. 1998) (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)).

At the same time, the court cannot act as an uncritical "rubber stamp" for the Commissioner's decision and should only affirm findings of fact when they are supported by substantial evidence. Howell v. Sullivan, 950 F.2d 343, 347 (7th Cir. 1991); Hereford v. Shalala, 48 F.3d 1221 (7th Cir. 1995). Substantial evidence includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). In social security disability hearings, "[i]t is a basic obligation of the ALJ to develop a full and fair record." Thompson v. Sullivan, 933 F.2d 581, 585 (7th Cir. 1991) (quoting Smith v. Secretary of Health, Education and Welfare, 587 F.2d 857, 860 (7th Cir. 1978)). Failure to fulfill this duty constitutes good cause to remand for gathering of additional evidence. Cannon v. Harris, 651 F.2d 513, 519 (7th Cir. 1981).

## B. Five-Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. York v. Massanari, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? See 20 C.F.R. §§ 404.1520, 416.920; Clifford, 227 F.3d at 868.

A claimant will automatically be found disabled if she makes the requisite showing at steps one through three. Henderson ex rel. Henderson v. Apfel, 179 F.3d 507, 512 n. 3 (7th Cir. 1999); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995). If the claimant is unable to satisfy step three, she must then show that she lacks the RFC to perform her prior work. Henderson, 179 F.3d at 512 n. 3. If she makes this showing, the burden then shifts to the Commissioner to show that the claimant has the ability to engage in other work existing in significant numbers in the national economy. Young v. Secretary of Health and Human Svcs., 957 F.2d 386, 389 (7th Cir. 1992).

## C. Analysis

Ulloa argues that the ALJ erred in two respects: (1) she failed to give proper consideration to the effects of Ulloa's obesity on her RFC; and (2) she materially misstated the medical evidence regarding the nature and extent of Ulloa's knee injury which, in turn, affected her credibility determination. The Court addresses each argument, beginning with the second issue raised by Ulloa.

### 1. The ALJ's Characterization of the Medical Evidence Regarding Ulloa's Knee Injury and Credibility Determination

Ulloa claims that the ALJ mistakenly characterized her untreated ACL tear as a strain. Pl's Mot., pp. 9-10 (citing R. 14-16, 28-29, 159, 215). Ulloa's argument is based on the ALJ's statement that: "A May 1999 MRI study of the left knee revealed a chronic interstitial tear of the [ACL], but no evidence for meniscal tears" (R. 14), and her subsequent statement that: "Although a 1999 MRI revealed the ACL was torn, recent doctor notes refer to the claimant's knee as just having a 'strain.'" (R. 16)[2]

In the Court's view, the ALJ did not improperly characterize Ulloa's knee injury; she was cognizant of the fact that Ulloa had a torn ACL, and her characterization of Ulloa's knee injury was consistent with the evidence in the medical record. First, she noted in her decision that a May 1999 MRI had revealed a chronic interstitial ACL tear, and she never stated that the ACL tear had been successfully treated; in fact, she recognized that Ulloa needed ACL reconstructive surgery to repair the torn ACL. (R. 15) Second, as the ALJ stated in her decision, more recent

---

[2]     Ulloa also relies on a point during the hearing wherein the ALJ stated: "I don't see it referred to as a torn ACL in [] any of your records. Although it has been recommended that you maybe [] need to undergo some ACL reconstructive surgery." (R. 28-29)

doctor notes did refer to Ulloa's knee as being just "strained." For instance, in his letter dated February 28, 2001, Dr. Hall stated, "[Ulloa's] knee remains extremely symptomatic. The original diagnosis was a strain of the ACL ligament and this has left her unable to withstand long durations of walking, standing, and she is not able to do any heavy lifting." (R. 215). In addition, in his medical note dated the same day, Dr. Hall recorded his diagnosis as a "Strain." (R. 270)[3] Thus, the ALJ's statements regarding Ulloa's knee injury were not a misstatement of the medical evidence. Moreover, as the Commissioner points out, regardless of whether Ulloa's knee injury was characterized as an ACL tear or a strain, the ALJ's determination accommodated the limitations described in the medical record as a result of Ulloa's knee injury. Specifically, Dr. Hall's February 2001 letter shows that Ulloa's knee injury limited her from performing long durations of walking and standing or doing any heavy lifting (R. 215); likewise, the ALJ limited Ulloa from long durations of walking and standing or any heavy lifting (R. 18).[4] Dr. Hall indicated that these limitations would preclude Ulloa from performing her past job as a nurse's aid. (R. 215) The ALJ agreed. (R. 17). Accordingly, for both of these reasons the Court finds the ALJ's characterization of the medical evidence to be acceptable.[5]

---

[3]     As for the ALJ's statement at the hearing that she did not see where in the record Ulloa's injury was referred to as a torn ACL, the Court finds this statement to be of little relevance, as the ALJ apparently found later where, in the record, Ulloa's injury was referred to as a torn ACL. See R. 14 ("A May 1999 MRI study of the left knee revealed a chronic interstitial tear of the [ACL]").

[4]     The ALJ limited Ulloa from lifting more than 10 pounds at a time or more than occasional lifting or carrying of small articles like docket files, ledgers or small tools, and from standing and walking for many than a total of two hours in an eight-hour workday. (R. 13-14, 18)

[5]     Ulloa also asserts that the ALJ erroneously lifted various statements from the medical record to support her characterization without providing the full context of those statements. Pl's Mot., pp. 10-11 (citing R. 15, 260, 269). The Court disagrees. Turning to the first example cited in Ulloa's brief (R. 269), Dr. Hall's record states: "[S]he has an ACL strain, but overall, her knee has improved. . . . [Ulloa] will be discharged from care at this time ...." (R. 269) The ALJ's statement that "there was

17

In a related argument, Ulloa argues that if the ALJ had not mischaracterized or misunderstood Ulloa's knee injury, she would not have determined that Ulloa lacked credibility. Pl's Mot., pp. 11-12. Thus, Ulloa argues, the ALJ's credibility determination was erroneous. Pl's Mot., p. 12. In support of her argument, Ulloa focuses on the ALJ's statement that "[Ulloa's] description of the severity of the pain has been so extreme as to appear implausible, especially in light of medical records that reflect substantial improvement in her symptoms." Pl's Mot., p. 12 (citing R. 16) Ulloa asserts that this statement might have been reasonable if she had only been suffering from a sprain,[6] but she was suffering from a torn ACL. Pl's Mot., p. 12. Ulloa argues that this credibility determination had significant impact on the ALJ's decision, as it led the ALJ to conclude that Ulloa could perform a significant number of jobs in the Chicago area when she might not otherwise have so concluded. Pl's Mot., pp. 12-13. Specifically, Ulloa relies on the VE's opinion that if Ulloa's testimony regarding her restrictions and limitations — including her need to lie down and ice and elevate her leg on occasion throughout the day — was accurate in all respects (and thus Ulloa's testimony was credible), there would be no jobs Ulloa could perform. Pl's Mot., pp. 12-13 (citing R. 56-57).

---

overall significant improvement to the left knee and that she was being discharged from [Dr. Hall's] care to do activities as tolerated" (after her statement that recent doctor notes referred to Ulloa's knee as being "strained") is consistent with the medical record. With regard to the second example cited in Ulloa's brief (R. 260), the Court agrees that Dr. Prunskis was referring to an improvement from an acute exacerbation and not an overall improvement, but disagrees that the ALJ's statements imply only the latter. The ALJ stated in the very preceding paragraph of her decision that Ulloa needed reconstructive surgery for her torn ACL; her statement that there was "improvement" to the knee does not imply that the torn ACL had improved overall. (R. 14-15) Thus, the Court finds this statement by the ALJ, too, to be consistent with the medical record.

[6]     Ulloa asserts earlier in her argument that the ALJ mistakenly characterized her ACL tear as a "strain" (not a "sprain"). Pl's Mot., p. 10.

18

The Commissioner defends the ALJ's determination that Ulloa was not fully credible by arguing that it was based on numerous regulatory factors, and not solely on any conclusion that Ulloa had a strained knee. Def's Mem., p. 9 (citing R. 16).[7] The Commissioner concludes that because the ALJ reasonably concluded that Ulloa's allegations of functional limitation were not fully credible, she was not required to adopt the VE's testimony regarding those limitations she did not find credible. Def's Mem., p. 11.

An ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. To meet the requirements of SSR 96-7p, an ALJ must do more than simply recite the factors described in the regulations for evaluating symptoms. Id. Ulloa argues that the ALJ reached her conclusions about her credibility based on a misunderstanding about her knee injury (i.e., that she had a strain rather than a torn ACL). As discussed above, the Court finds that the ALJ did not misunderstand or misstate the evidence regarding Ulloa's knee injury. In any event, though, the ALJ's opinion enumerated several specific reasons as to why she discounted Ulloa's testimony, including that: the medical records reflected substantial improvement in her symptoms which undermined Ulloa's allegations of disabling pain; Ulloa's treatment was routine and/or conservative in nature and not the type one would expect for a totally disabled individual; Ulloa's use of medications did not suggest the presence of impairments which were more limiting than those found by the

---

[7]     The Commissioner relies on 20 C.F.R. §§ 404.1529(c)(2), (c)(3)(v), (c)(3)(i), and (c)(3)(iv) to support her argument.

19

ALJ; Ulloa's daily activities were not limited to the extent one would expect based on her complaints; and the RFC conclusions reached by the state agency physicians supported a finding of "not disabled." (R. 16-17) In light of these asserted reasons, which, as the Court explains below, were not only discussed by the ALJ in her opinion but were supported by the record, the ALJ's credibility determination was not erroneous.

As an initial matter, the Court notes that the ALJ did not merely recite her reasons; she explained her reasons in her decision. She discussed her opinion that Ulloa's allegations of disabling pain were undermined by the medical records reflecting substantial improvement in Ulloa's symptoms (see R. 14-15); she discussed her opinion that Ulloa's treatment was routine and/or conservative in nature (see R. 14-16); and, she discussed the extent of Ulloa's daily activities (see R. 16). Ulloa's speculation that the ALJ's credibility determination was based solely on her belief that Ulloa had a strain and not a tear is just that – speculation. Based on the text of the ALJ's decision, the ALJ based her credibility determination on all of the aforementioned factors, and not on a conclusion that Ulloa had a strained knee.

Moreover, the asserted reason with which Ulloa takes issue (namely, that Ulloa's description of the pain appears implausible in light of medical records reflecting substantial improvement) is supported by the record. The medical records reflect improvement in many of Ulloa's impairments, and the ALJ cites to and discusses these medical records in her decision. See, e.g., R. 14 ("Dr. Wolschlager reported that the claimant's condition was improving, even though she continued to complain of mild low back pain with mild stiffness and mild restricted motion"); R. 15 ("She was fitted for a knee brace in September 2000, which proved to be helpful"); id. ("Dr. Hall reported that there was overall significant improvement to the left

20

knee"); R. 16 ("While she has had to use a walker in 1998 and crutches in 1999, she has not had to use any assistive device to walk in 2000-01"). The Court finds that the ALJ's conclusion (that the medical records reflecting substantial improvement undermine Ulloa's allegations of disabling pain) was supported by the evidence in the record and not by an erroneous assumption that Ulloa had a strained knee. The ALJ's characterization of Ulloa's knee injury and credibility findings are therefore sufficient and not grounds for reversal or remand.

### 2.  The ALJ's Consideration of the Effects of Ulloa's Obesity

Ulloa next argues that the ALJ failed to properly consider the effects of Ulloa's obesity on her other conditions, or explain her conclusions as to the effects of the obesity on Ulloa's other conditions, as she was obligated to do. Pl's Mot., pp. 5-6. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00(Q) ("when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's [RFC], adjudicators must consider any additional and cumulative effects of obesity"); SSR 00-3p, 2000 WL 33952015 (S.S.A. 2000) ("[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity," and "[a]s with any other impairment, [the adjudicator] will explain how [she] reached [her] conclusions on whether obesity caused any physical or mental limitations").[8] Ulloa argues that the ALJ merely recited the existence of Ulloa's obesity and did not explain why Ulloa's weight did or did not produce greater limitations. Pl's Mot., pp. 7-8.

---

[8]      SSR 00-3p was superseded by SSR 02-01p on September 12, 2002. 2000 WL 628049 at *1 (S.S.A. 2002). However, SSR 00-3p was in effect at the time of the ALJ's decision, and thus is the ruling applicable to this case. SSR 02-1p specifically indicates there were no substantive changes to the procedure contained in SSR 00-3p.

21

She argues that although listing 9.09, Obesity, was deleted from the listing of impairments contained in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Ulloa's weight exceeded that old listing level and Ulloa would have met the weight/height guidelines provided in listing 9.09 prior to the deletion of that listing in October 1999. As such, Ulloa argues that her extreme obesity merited "a substantial consideration" of the effects of that obesity on her other conditions. Pl's Mot., p. 7. Ulloa argues that by failing to explain her conclusions, the ALJ failed to "build an accurate and logical bridge between the evidence and the result." Pl's Reply, p. 3 (citing Sarchet v. Chater, 78 F.3d 305, 305 (7th Cir. 1996)).

In support of her argument, Ulloa asserts that while the ALJ referenced Dr. Prunskis' finding that Ulloa's weight contributed to her back pain, hip pain, and knee pain, she did so in a perfunctory manner, without actually considering that evidence in her analysis. Pl's Mot., p. 8 (citing R. 15).[9] Ulloa further relies on the ALJ's reference to Dr. Hall's statement that Ulloa would have to bring her weight down to 190 pounds before ACL reconstructive surgery could be performed. Pl's Mot., p. 7 (citing R. 15). Ulloa argues that the ALJ must not have taken Ulloa's obesity into account, as Ulloa would have to lose 160 pounds before she would reach the 190-pound mark and become eligible for the ACL reconstructive surgery. Pl's Mot., pp. 7-8.

In response, the Commissioner argues that the ALJ found Ulloa's obesity to be severe and considered the effects of Ulloa's obesity on her other conditions. Def's Mem., pp. 6-7 (citing R.

---

[9]     Ulloa similarly argues that the ALJ failed to actually consider the effects of Ulloa's obesity on her other conditions despite her statement that she was "taking into consideration the combined effects of obesity with the claimant's lower back pain and left knee pain, ..." Pl's Mot., p. 8 (referring to R. 12).

22

12, 15).[10] In support of her argument, the Commissioner relies on the same statements made by the ALJ that Ulloa relies on, but asserts that they show the ALJ did consider the effects of Ulloa's obesity in her decision. Def's Mem., pp. 6-8 (referring to R. 12, 15). For instance, the Commissioner points to the ALJ's statement, "[T]aking into consideration the combined effects of obesity with the claimant's lower back pain and left knee pain, these conditions are not accompanied by the neurological deficits required under either section 1.03 or 1.05C of the Listing of Impairments, nor does the record contain other findings of equivalent severity." Def's Mem., p. 7 (citing R. 12) The Commissioner argues that the ALJ did more than simply state she was taking into consideration the effects of Ulloa's obesity, she noted in support of her findings that Ulloa's lumbar spine was normal and that the record contained no opinions from any physicians indicating that Ulloa had limitations greater than those determined by the ALJ. Def's Mem., pp. 7-8 (citing R. 15, 215-18, 272-73). In addition, the Commissioner argues that while the ALJ referenced Dr. Hall's opinion that Ulloa could not have reconstructive surgery until her weight was brought down to 190 pounds, she did so while noting that a knee brace had proved helpful. The Commissioner further argues that the limitations found by the ALJ fully accommodated the limitations suggested by Dr. Hall. Def's Mem., p. 7 (citing R. 15, 18, 205)[11]

---

[10] The Commissioner also argues that Ulloa's assertion that her obesity was medically equivalent to former listing 9.09 should be rejected because she failed to show that she had the other findings required to meet or medically equal that listing. Def's Mem., p.6. In reply, Ulloa argued that she was not asserting that she met or medically equaled the listing, but, rather, that her weight was greater than the levels required to meet one of the elements of former listing 9.09, and that it should be used as a benchmark for determining that Ulloa's obesity was severe. Pl's Reply, p. 1.

[11] Specifically, Dr. Hall indicated that Ulloa would not be able to stand for prolonged periods, move about a great deal, or lift and carry heavy objects due to back and knee pain (R. 205); similarly, the ALJ found that Ulloa could perform sedentary work which required standing and walking no more than two hours in an eight-hour day, occasional stooping, crouching, climbing, and kneeling, and not lifting more than 10 pounds occasionally. Def's Mem., p. 7 (citing R. 15, 18).

Finally, the Commissioner argues that Ulloa has not explained, e.g., by providing testimony or citing evidence regarding, how her obesity further reduced her RFC. Def's Mem., p. 8.

In reply, Ulloa argues that Dr. Hall suggested significant functional limitations which indicated that he believed obesity played a significant part in Ulloa's limitations and that her limitations were greater than those determined by the ALJ. Pl's Reply, p. 2. Ulloa again relies on Dr. Hall's statement that she could have an ACL reconstruction when she reached 190 pounds to support this point. Pl's Reply, p. 2 (citing R. 206).

It is well established that an ALJ must build an accurate and logical bridge between the evidence and her conclusions. Green v. Apfel, 204 F.3d 780, 781 (7th Cir. 2000); Sarchet, 78 F.3d at 307 (reversing ALJ's decision where "the reasons given by the trier of fact d[id] not build an accurate and logical bridge between the evidence and the result"). The Court agrees that, in this case, although the ALJ did not misstate the medical evidence regarding Ulloa's knee injury, as found above, she did not sufficiently explain her consideration, if any, of the effects of Ulloa's obesity on her knee injury or any of her other conditions. As Ulloa points out, while the ALJ stated that she was "taking into consideration the combined effects of obesity with the claimant's lower back pain and left knee pain," her analysis did not indicate that she did consider the effects of Ulloa's obesity on her other conditions. For instance, although referencing Ulloa's obesity on several occasions throughout her decision, she never explained how the obesity affected or did not affect Ulloa's other conditions. See, e.g., R. 12, 13, 15, 16. Moreover, although she recited Dr. Prunskis' indication that Ulloa's weight contributed to her pain, she did not appear to take this factor into account in her analysis, either. She merely stated that Dr. Prunskis also noted improvement in Ulloa's left knee. (R. 15) In addition, as Ulloa points out, the ALJ did not

24

explain, or even address, the fact that Ulloa must lose 160 pounds before she would be eligible for reconstructive surgery on her torn ACL, or that she was gaining rather than losing weight around the time of the hearing. Although the Commissioner argues that "[s]ubstantial evidence supports the ALJ's conclusion" (Def's Mem., p. 7), the ALJ, not the Commissioner, must explain her conclusions in her decision. SSR 00-3p. Here, the Commissioner is just speculating as to the ALJ's conclusions regarding the effects of Ulloa's obesity on her other conditions. The ALJ's determination is therefore not consistent with the relevant Social Security Regulations requiring her to consider the effects of Ulloa's obesity on her other conditions and explain her conclusions as to whether the obesity caused any additional physical or mental limitations. 20 C.F.R. Pt. 404, Subpt. P, App. 1; SSR 02-01p. Ulloa's motion for remand on this basis is therefore granted.

## CONCLUSION

For the reasons stated above, Ulloa's Motion for Summary Judgment (Docket Entry #11-1) is granted, and the case is remanded for further proceedings consistent with this opinion.

NAN R. NOLAN
United States Magistrate Judge

Dated: October 17, 2003

25